UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| CELENA PRESLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-00112-BG |
| | ) | ECF |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### Statement of the Case

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Celena Presley seeks judicial review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) and supplemental security income (SSI). The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Presley was afforded an opportunity to consent to the jurisdiction of a United States Magistrate Judge, but she did not do so. Pursuant to the order of assignment, the undersigned now files this Report and Recommendation.

Presley applied for DIB on April 1, 2004, and applied for SSI on March 9, 2004, claiming an onset date of January 13, 2003, in both cases. She had insured status through September 30, 2009. Her claims were denied initially and on reconsideration. A hearing was held before an Administrative Law Judge (ALJ). Through counsel, Presley amended her disability onset date to April 12, 2004. On May 22, 2006, the ALJ issued an unfavorable decision. The Appeals Council vacated the ALJ's decision and remanded. Following a new hearing on March 27, 2008, the ALJ

issued another unfavorable opinion.  The ALJ determined that Presley had the following severe impairments: fibromyalgia, anxiety/depression, chronic obstructive pulmonary disease (COPD), cervical disc disease, and "possible history of transient ischemic attacks." (Tr. 20.) The ALJ found that (1) Presley had the Residual Functional Capacity (RFC) to perform sedentary work with additional nonexertional limitations; (2) her statements regarding the intensity, duration, and limiting effects of her pain were not entirely credible; and (3) jobs existed in significant numbers in the national economy that she could perform.  (Tr. 21–29.)  The Appeals Council denied review. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review.  *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

## Factual Background

From Presley's earliest years, she was plagued by medical troubles.  At approximately two years of age, medical personnel discovered that Presley had a third kidney, which was surgically removed.  (Tr. 328.)  Her troubles continued and at age 14 Presley was admitted to Hendrick Memorial Hospital due to recurrent urinary tract infections and left ureteral vesicle reflux; she then underwent a left ureteral reimplantation surgery.  (Tr. 326–27.)  Medical records show that she has consistently been seen for renal and urinary issues, including recurrent, chronic urinary tract infections.  (*See, e.g.*, Tr. 313–14, 366, 372, 375, 394, 454, 515.)  Presley also has a history of uncontrolled or poorly controlled hypertension.  (*See, e.g.*, Tr. 291–94, 298–99, 354–56, 372, 522–23, 565, 585, 648.)  When she was seen by Jack Bargainer, M.D. in May 2005, he noted her hypertension had been increasing in severity.  (Tr. 448–50.)  Presley, a smoker, was also diagnosed

with COPD by both treating physician Penny Jeffery, M.D. and Dr. Bargainer.  (Tr. 291–94.)

In January 2003, Presley was seen by Sreenivas Gudimetla, M.D. and was put on a Holter monitor to evaluate her heart activity; the report indicated that she had a sinus mechanism with occasional premature ventricular contractions and occasional couplets.  (Tr. 271–73.)  In March 2003, Presley was treated for sleep apnea by James Duke, Ph.D., and she underwent a comprehensive polysomnography.  (Tr. 338, 524–29.)  It was recommended that she would benefit from continuous positive air pressure (CPAP), and if CPAP could not be tolerated, surgical solutions should be considered.  *Id.*

Dr. Jeffery, Presley's family physician, referred Presley to Dr. Bargainer to address her shortness of breath, lightheadedness, and palpitations.  (Tr. 291–94.)  On May 13, 2003, Dr. Bargainer diagnosed Presley with hypertension, hypertensive cardiovascular disease, COPD, chronic pyelonephritis, and sleep apnea.  *Id.*  He recommended that Presley cease smoking, begin taking Singulair, and retest to see if her current CPAP was effective.  *Id.*  He also recommended that Presley, who at the time weighed  276 pounds, lose weight and noted that if she did lose weight, "this might eliminate the problem of sleep apnea."  *Id.* at 293.

Dr. Jeffery saw Presley on August 11, 2003, and noted that Presley was suffering from nausea and vomiting and was not sleeping.  (Tr. 379.)  Presley's insurance company had determined that sleep apnea was pre-existing and therefore not covered; Presley could not afford the CPAP machine on her own and had to return it.  *Id.*

An August 19, 2003, note indicates that Presley called Dr. Jeffery complaining that her feet hurt and "feel like they are broken," that she was not sleeping well, and that she hurt all over with numbness and tingling.  (Tr. 378.)  Due to the chronic pain and myalgias, Dr. Jeffery prescribed

Neurontin.  *Id.*  On August 25, 2003, Presley complained of aching all over with radiating pain from her back to hips, inability to sleep because of her restless legs, and an area across her back that felt numb and tingly all the time.  (Tr. 377.)  She asked about fibromyalgia because a family member had it, and tender points on her upper back, buttocks, and right second rib were noted.  *Id.*  She only exhibited five of eighteen tender points at that time, so Dr. Jeffery considered it unlikely that Presley had fibromyalgia.  *Id.*  Presley was still working at that time.  *Id.*

A January 2004 note indicates that Presley presented with shortness of breath, chest pain, joint swelling, and pain in her muscles and joints.  (Tr. 372.)  Dr. Jeffery noted that it was "probably fibromyalgia."  *Id.*  In February 2004, Dr. Jeffery again noted that Presley had "probable fibromyalgia . . . Won't diagnose fibromyalgia yet."  (Tr. 370.)

Presley was referred to Mohammad Maher Al-Sayyad, M.D., F.A.C.P. in April 2004 for hematuria and protienuria.  (Tr. 340–42.)  An intravenous pyelogram (IVP) was conducted several days later, and a possible filling defect in the right renal pelvis was noted, in addition to moderate dilatation of the collecting system.  *Id.*

On May 26, 2004, Presley reported in a Daily Activity Questionnaire that it took her about half of the day to bathe and dress because she got "so short of breath from the COPD [and] so fatigued from everything else."  (Tr. 225.)  She also noted that she rarely left the house and that her daughter did the cleaning, cooking, shopping, and laundry.  (Tr. 226.)  She stated that she could not handle "things out of s[y]nc"; as a result, she got nervous, upset, and retreated to a quiet place.  *Id.*

Presley was referred by the Department of Assistive and Rehabilitative Services (DARS) to Stephen M. Osborn, Ph.D., P.C., LSSP, FPPR for a psychological evaluation on July 6, 2004.  (Tr. 351–52.)  Her concentration was fair.  She was able to recall well, but Dr. Osborn noted that she

showed anxiety and depression in the form of withdrawal and avoidance.  *Id.*  He noted her primary diagnoses were medically related to fibromyalgia and COPD.  *Id.*  She was able to take care of her personal needs, transport herself, and do regular shopping, among other things; he further noted that her ability to adapt and cope in stressful situations was fair.  *Id.*  She was able to understand and carry out short, simple instructions.  *Id.*  While her daily decision making and ability to maintain pace without intrusive symptoms were generally adequate, she appeared to be affected by fatigue and fibromyalgia.  *Id.*  He diagnosed Presley with depression not otherwise specified (NOS), anxiety disorder NOS, personality disorder NOS, COPD, fibromyalgia, sleep apnea, and restless leg syndrome and gave her a guarded prognosis because her "problems have not been resolved and she has not followed through on medical recommendations and medications."  *Id.*

On July 7, 2004, Presley was evaluated by S. Daggubati, M.D. at the request of DARS.  (Tr. 354–56.)  Presley complained of increasing aches and pains throughout her body for the last two years and increased pain when she walked or lifted small weights, though it did improve with rest.  *Id.*  Her forward bending was eighty degrees, lateral bending was full range, and side bending was sixty degrees.  *Id.*  She exhibited right hip joint tenderness and some limited range of motion.  *Id.*  She had several tender points over both sides of her neck, lower back, knees, and hips.  *Id.*  In his examination of her actual joints, Dr. Daggubati noted that her shoulders, elbows, wrists, knees, and ankle joints were normal and that her right hip showed tenderness and limited range of motion.  *Id.*  Dr. Daggubati diagnosed Presley with "fibromyalgia with aches and pains and also tender spots with functional impairment in walking and lifting"; mild COPD with mild functional impairment in walking up hills and lifting weight; arthritis of the right hip joint with functional impairment in squatting and walking on her tiptoes and heels; migraine headaches; moderately controlled

hypertension; and myopia, which was corrected by lenses.  *Id.*

Frederick Cremona, M.D. completed a physical RFC assessment on August 3, 2004, and found that Presley could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk with normal breaks for six hours out of an eight-hour work day; sit with normal breaks for six hours out of an eight-hour day; push or pull an unlimited amount; occasionally climb, balance, kneel, and crawl; and frequently stoop and crouch.  (Tr. 407–14.)   A handwritten note states, "Claimant is partially credible based on [activities of daily living], CE and 3rd party information." *Id.*

On September 24, 2004, Stephanie Judice, M.D. performed a mental RFC assessment on Presley, whom she considered to be moderately limited in the ability to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; and (3)  maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 415–31.)  Dr. Judice diagnosed Presley with depression and anxiety.  *Id.*

James A. Wright, M.D. completed an additional RFC assessment on September 27, 2004, and found that Presley could occasionally lift twenty pounds and frequently lift ten pounds; could stand or walk for six hours in an eight-hour day; could sit for six hours in an eight-hour day; could push or pull an unlimited amount; could occasionally climb, balance, stoop, kneel, crouch, or crawl; and should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. 433–41.)

In November 2004, Presley first complained of having a "strange episode," in which she felt heavy all over, hallucinated, and slurred her speech.  (Tr. 531.)  Dr. Jeffery made notes of possible causes but noted that Presley could not afford tests.  *Id.*  Dr. Jeffery referred Presley back to Dr.

Bargainer for evaluation of the "spells." (Tr. 448–50.) She reported that she had no memory of the spells and that her family members told her about them; after an episode, she reported feeling heavy and tired and wanted to lie down. *Id.* She had increasing hypertension and reported transient headaches, which lasted for a day or two. *Id.* She was mildly and chronically short of breath from her COPD. *Id.* Dr. Bargainer noted that Presley had lost approximately 100 pounds since she visited him the previous year. *Id.* She walked with a limp and generally moved slowly. *Id.* He noted that she had severe hypertension, possible seizure disorder, hypertensive cardiovascular disease, and chronic hematuria of undetermined origin. *Id.* He ordered an MRI, EEG, and an event recorder to be worn to check for cardiac dysrhythmias related to her spells. *Id.*

On January 5, 2005, Presley was seen by Dr. Jeffery and received an injection in her right hip and right shoulder for pain. (Tr. 509.) An examination revealed a tender spot on the top of her shoulder, in addition to right bursal and sciatic tenderness. *Id.*

Presley continued to complain of pain in her hip, thoracic, lumbar, and spinal regions in addition to numbness in her right leg. (Tr. 478.) MRIs were ordered due to her worsening back and leg pain and known degenerative disc disease (DDD). (Tr. 471.) At the C4-5 level, there was a large, broad-based right paracentral, central, and to a lesser degree, left paracentral disc protrusion effacing the thecal sac and distorting the spinal cord; marked narrowing of the right neural foramen from uncovertebral osteophytes and from the disc was also seen. (Tr. 469–70.) There was also bilateral neural foraminal narrowing at C5-6. *Id.* Additionally, the lumbar spine MRI revealed a slight disc dessication at L4-5 and mild osteoarthritis of the right facet joint at L5-S1. *Id.* X-rays of the thoracic spine revealed mild spondylosis, and the cervical spine views showed moderately large posterior osteophytes at C4-5 and C5-6. (Tr. 472.)

At Dr. Jeffery's request, Mark S. Maxwell, D.O. reviewed Presley's records and noted a "fairly worrisome lesion" at C4-5.  (Tr. 521.)  He indicated these lesions often result in pain traveling down the spine and can affect the arms and legs; he suspected that Presley had pain in her arms, through her shoulders and into her upper body, possibly down to her thumbs, as well as dull hip and back pain.  *Id.*  While he noted Presley's desire to avoid surgery, he indicated that she would be at risk if her stenosis was truly as bad as the MRI indicated.  *Id.*

In January 2006, an ambulance was called because "a woman was having seizures in the drive through" of Chicken Express.  (Tr. 582.)  Presley, the woman in question, was with a family member and was unable to speak upon the arrival of medical personnel.  *Id.*  She eventually refused transport to the hospital and advised that she would seek medical care.  *Id.*  A carotid dopscan was performed and revealed severe tortuosity throughout bilateral internal carotid arteries; Presley's diagnosis was transient ischemic attacks.  (Tr. 575.)

On February 27, 2006, Dr. Jeffery wrote a letter in support of Presley's application for disability, in which she noted that Presley had been unable to work for two years and had great difficulty working prior to that.  (Tr. 515.)  She noted that Presley had chronic pain from fibromyalgia and cervical DDD, in addition to COPD, chronic kidney problems, recurrent UTIs, hypertension, and hypertensive cardiovascular disease.  *Id.*  In addition, she stated that Presley had sleep apnea but could not tolerate the CPAP machine and that she had occasional "spells," for which the medical cause was not yet determined.  *Id.*  Dr. Jeffery also completed a Medical Source Statement, which stated that Presley could stand or walk for fifteen minutes before alternating positions to sit or lie down; sit in a working position without reclining or leaning back for thirty minutes before alternating positions to sit or lie down; work for two to three hours in an eight-hour

day; lift up to twenty pounds occasionally; balance frequently; crawl occasionally; and rarely/never bend or climb; stoop, kneel, reach, grasp, or finger with either hand occasionally. *Id.*  Dr. Jeffery also stated that Presley would need to rest for two hours in an eight-hour day for pain management. *Id.*

Presley continued having "spells" and in June 2006, Dr. Jeffery referred her for a neurological consult.  (Tr. 563, 565.)  Dr. Jeffery wrote a more detailed letter following Presley being denied benefits.  (Tr. 522–23.)  She emphasized that Presley had pain complaints for some time, but the symptoms had worsened in 2003.  *Id.*  Dr. Jeffery explained that on examination Presley had multiple tender points, primarily in her upper body, lower back, and right hip, and that fibromyalgia was a tentative diagnosis because Dr. Jeffery was not a rheumatologist.  *Id.*  She also noted that Presley's case was complicated by the fact that at least part of her pain was discogenic, which Dr. Jeffery thought might be combining with Presley's hypertension to cause her headaches. *Id.*  Further, Presley was distressed by major events and concerned and focused on her physical health and illnesses.  *Id.*  Dr. Jeffery felt that Presley had an extremely limited ability to work.  *Id.* While Dr. Jeffery said she still generally agreed with her Medical Source Statement, she would now limit Presley to lifting no more than ten pounds.  *Id.*  Dr. Jeffery believed that Presley would have a hard time dealing with work stresses because of her pain symptoms, and she recommended only part-time or volunteer work.  *Id.*  She indicated that while Presley was compliant and motivated, her financial situation made it difficult for her to get medical care.  *Id.*

On August 17, 2006, another cervical spine MRI was taken and showed the C4-5 level to have a broad-based disc bulge with a mild degree of central canal stenosis and right sided neuroforaminal narrowing to a mild degree secondary to uncovertebral joint hypertrophy and DDD.

The C5-6 level showed a broad-based disc bulge without significant central canal stenosis and a moderate degree of bilateral neuroforaminal narrowing.  (Tr. 555.)  Dr. Jeffery made a handwritten note at the bottom of the record that said, "Approximately the same as the 7/05 report[.] Not quite as bad."  *Id.*

Daniel J.M. Vaughan, M.D., FRCPC saw Presley for a neurological consult regarding her spells.  (Tr. 537–40.)  He stated that her spells were of indeterminate etiology but were perhaps ictal.  *Id.*  He prescribed Topamax for the headaches and spells and if the spells continued, he recommended epilepsy monitoring if the spells continued.  *Id.*

On December 8, 2006, Douglas E. Krug, Ph.D. felt that Presley presented with several diagnoses that indicated stress-related illness expressed through somatic symptoms.  (Tr. 543.)  He diagnosed her with anxiety, major depressive disorder, and a recurrent pain disorder with both psychological factors and a general medical condition.  *Id.*

Presley continued to have pain problems; Dr. Jeffery noted she had right sciatic tenderness and right lateral grade trochanteric tenderness and attributed the chronic pain to fibromyalgia.  (Tr. 677, 655, 649.)

In response to the ALJ's letter requesting more information, Dr. Jeffery indicated that she found some discrepancies between the limitations provided by the ALJ and what she believed Presley could do.  (Tr. 577–78.)  Dr. Jeffery found Presley "more limited with regard to the use of her arms and hands.  This is due to the muscle tension resulting from fibromyalgia and cervical degenerative disc disease."  *Id.*  She also stated that the August 2006 MRI confirmed serious problems.  *Id.*  Additional limitations Dr. Jeffery thought were appropriate that the ALJ did not include were no lifting more than ten pounds; no reaching, grasping and fingering more than

occasionally; and no more than three to four hours per day of sitting, standing, or walking, after which she would need two hours to rest. *Id.*

A hearing was conducted on March 27, 2008. (Tr. 748.) In addition to testimony from Presley and her daughter, the ALJ heard testimony from John F. Simonds, M.D. (medical expert), who is certified by the American Board of Psychiatry and Neurology. (Tr. 766–76.) A vocational expert, Michael L. Driscoll, M.S. also testified. (Tr. 776–85.)

### Standard of Review

A plaintiff is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (2011).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). RFC is defined as "the most [a claimant] can still do despite [his]

limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

Judicial review of a decision by the Commissioner is limited to two inquiries: "whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

## Discussion

Two of Presley's arguments are that (1) substantial evidence does not support the ALJ's credibility finding, and (2) the ALJ did not properly address Dr. Jeffery's treating source opinion. These arguments have merit and require remand.

## I.      The ALJ's credibility finding regarding Presley's complaints of pain is not supported by substantial evidence.

Presley argues that the ALJ did not follow the proper legal standards for assessing her credibility regarding her complaints of pain. The ALJ found that Presley's allegations of pain and other symptoms were out of proportion to physical findings. (Tr. 26.)

An ALJ must consider a claimant's testimony regarding subjective evidence of pain, and if a claimant would prevail if her subjective complaints were believed, an ALJ must make a determination of the truthfulness and credibility of the allegations. *Scharlow v. Schweiker*, 655 F.2d

645, 648 (5th Cir. 1981).  In making a credibility determination, the ALJ must consider (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his pain or other symptoms; (5) treatment other than medication the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions caused by pain or other symptoms.  20 C.F.R. §§ 404.1529(c), 416.929(c).  The ALJ's findings must be specific enough to make clear to the individual and subsequent reviewers the weight given to the individual's statements and the reason for the weight given.  *See* SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  An ALJ's determination that a claimant's subjective complaints of pain are of a non-disabling nature merits considerable judicial deference; the court is charged with determining whether substantial evidence in the record as a whole supports the ALJ's determination.  *Chambliss v. Massanari*, 269 F.3d 520, 522–23 (5th Cir. 2001).

The ALJ cited the following reasons in support of his decision to discredit Presley's allegations of pain:

(1)     Presley's condition was "complicated by emotional factors," and she had a history of "adventitious complaints";

(2)     Presley's 2006 MRI identified "only mild central canal stenosis[,]" and an examining neurosurgeon "did not feel cervical stenosis was causing her pain";

(3)     Dr. Daggubati's fibromyalgia diagnosis appeared to be based on "little more than [Presley's] subjective complaints"; and

> (4)     Presley engaged in several activities of daily living as of July 2004, and the ALJ saw
>
> "no change in her physical condition since that date[.]"

(Tr. 24–26.)  Substantial evidence does not support the ALJ's reliance on any of these findings to

discredit Presley's subjective complaints of pain.  The ALJ's decision must "stand or fall with the

reasons set forth in the ALJ's decision[.]"  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000.)

## A.     Effect of emotional factors and "history of adventitious complaints"

The ALJ discredited Presley's complaints of pain in part because he felt her condition was

"complicated by emotional factors" and she had a history of "adventitious complaints going back

many years." (Tr. 26.) Substantial evidence does not support this.  The ALJ's reference to a history

of "adventitious complaints" is unclear.  The pages cited by the ALJ span from 1977 to 1988 and

include nineteen entries by medical personnel.  (Tr. 306, 308–10.)  These records from her youth

to early adulthood primarily are concerned with urinary/renal issues resulting from the kidney

removal and ureter reimplantation, and the medical personnel frequently indicate that she is to come

back in a month or every few months.  While the records indicate that Presley and her mother fought

often and that Presley had "little tissy-fit[s]" in the hospital, this does not explain or support the ALJ

discrediting Presley's allegations.  More recently, Presley was diagnosed by Dr. Krug with a pain

disorder, which was acknowledged by Dr. Jeffery in a letter to the ALJ.  (Tr. 543, 577.)  A pain

disorder involves "pain that is the predominant focus of the clinical presentation and is of sufficient

severity to warrant clinical attention."  (Pl.'s Br. 10 (quoting *Diagnostic and Statistical Manual of*

*Mental Disorders* 458 (4th ed., 1994).)  Even the Commissioner's medical expert testified before

the ALJ that a pain disorder makes a person's pain subjectively greater than the objective findings.

(Tr. 773.)  Dr. Jeffery indicated in a letter to the ALJ that she was not a psychiatrist or psychologist,

14

but she had observed that Presley's pain symptoms did in fact increase when she is stressed.  (Tr. 577.)  The ALJ appeared to believe that Presley's psychiatric and emotional issues should have no effect on her pain, which is in direct conflict with uncontroverted medical evidence that her pain disorder would result in her pain being subjectively greater than objective findings would suggest.

### B.        The 2006 MRI and findings regarding cervical spine

Next, the ALJ discredited Presley's allegations of pain caused by her cervical spine issues.  Specifically, he stated that the 2006 MRI identified only mild central canal stenosis at C4-5 and "[a]n examining neurosurgeon did not feel cervical stenosis was causing her pain[.]"  (Tr. 26.)  The parties vigorously debate the implications of the two MRIs.  (Pl.'s Br. 11–13; Def.'s Br. 7–9; Pl.'s Reply 6.)  The MRIs in question, which were interpreted by different doctors, show the following:

|  | 2005 MRI | 2006 MRI |
|---|---|---|
| C4-5 | 1.  Broad-based right paracentral, central, and to a lesser extent left paracentral disc protrusion total effacing the thecal sac and distorting the spinal cord.<br><br>2.  Marked narrowing of the right neural foramen from uncovertebral osteophytes and from the disc. | 1.  Broad-based disc bulge causing a mild degree of central canal stenosis.<br><br><br><br>2.  Right-sided neuroforaminal narrowing to a mild degree secondary to uncovertebral joint hypertrophy and degenerative facet disease. |
| C5-6 | 1.  Bilateral neural foraminal narrowing from uncovertebral osteophytes. | 1.  Moderate degree of bilateral neuroforaminal narrowing secondary to uncovertebral joint hypertrophy and degenerative facet disease.<br><br>2.  Broad-based disc bulge without significant central canal stenosis. |

(Tr. 470, 555.)

15

The ALJ, relying on the testimony of the medical expert, incorrectly stated the 2006 MRI "represents improvement not recognized in any of Dr. Jeffery's observations." (Tr. 25, 770.) A handwritten note by Dr. Jeffery at the bottom of the 2006 MRI specifically acknowledges that the results are "[n]ot quite as bad," but she also noted they were approximately the same as the 2005 MRI. (Tr. 555.) Dr. Jeffery expressly acknowledged that there was some degree of improvement, but she clearly stated in multiple records, including a letter to the ALJ, that she believed Presley's pain was caused in part from her cervical DDD. (Tr. 511–14, 515, 522–23, 555, 577–78.)

The ALJ was also incorrect that an examining neurosurgeon felt that the cervical stenosis was not causing Presley's pain. (Tr. 24.) The neurosurgeon who reviewed Presley's materials and Dr. Jeffery's dictations wrote that lesions of the type shown in the 2005 MRI "quite often result in pain going down through the spine and into the back and can affect arms and legs equally. My suspicion is that she has pain in her arms, through her shoulders and into her upper arms and possibly even down to her thumbs and pain in the hips and in the back of the legs in a dull fashion." (Tr. 521.) The extensive medical records contained Presley's frequent complaints of pain in her back, hips, and arms, a statement from Dr. Maxwell about Presley's likely pain from her cervical issues, and numerous statements from Dr. Jeffery that cervical DDD was one cause of Presley's pain. *(See, e.g.* Tr. 377, 506, 471, 478, 515, 511–23, 521, 577–78, 652, 677.) In short, the overwhelming weight of medical evidence supports Presley's allegations of pain from her cervical spine issues.

**C.     Fibromyalgia**

Third, the ALJ discredited Presley's complaints of pain from fibromyalgia. (Tr. 24.) While the ALJ apparently found Dr. Daggubati's record, in combination with Dr. Jeffery's notes,

sufficiently credible at Step Two to determine fibromyalgia was a severe impairment, the ALJ discredited Dr. Daggubati's report in the credibility analysis. (Tr. 24.) The ALJ's decision displays a misunderstanding of the procedure to diagnose fibromyalgia. The ALJ felt Dr. Daggubati's diagnosis was based on Presley's subjective complaints because no tenderness was observed in his general examination of her neck, back, or chest wall and there were no abnormalities of her shoulders, wrists, or elbows. (Tr. 26.) The ALJ said Dr. Daggubati "then contradicted himself by noting tender 'spots' over her neck, low back, knees, and hips." *Id.*

Presley correctly points out that the tender point exam used to diagnose fibromyalgia includes palpitation of the "muscle, fat pad, and/or intertransverse space of the cervical spine, not the joints." (Pl.'s Br. 16.) In *Adams v. UNUM Life Ins. Co. of Am.*, the court explained that fibromyalgia is a rheumatic disorder involving "chronic pain, tenderness, and stiffness of muscles, tendons, and ligaments, without detectable inflammation." No. Civ. A. H-04-2179, 2005 WL 2030840, *13 (S.D. Tex. Aug. 23, 2005). Symptoms that characterize fibromyalgia can include "diffuse pain, tenderness, stiffness of joints, fatigue, cognitive and memory problems, and disturbed sleep." *Id.* The tender point sites are "fibrous tissue or muscles of the neck, shoulder, chest, rib cage, lower back, thighs, knees, arms (elbows), and buttocks." *Id.* Dr. Daggubati's exam revealed a normal joint examination, with the exception that the right hip joint was tender and limited in range of motion, and no tenderness of the neck, back, and chest wall. (Tr. 355.) The doctor's review of Presley's lymphatic system, peripheral vascular system and skin revealed several tender points over the neck, lower back, knees, and hips. (Tr. 356.) The ALJ's decision does not reflect the distinction in an examination of joints and general body parts and an examination for fibromyalgia tender points, which is conducted at very specific muscle or tissue sites.

The ALJ also wrongly stated that Presley had "self-diagnosed" fibromyalgia and that Dr. Jeffery had only found a few tender points and "conceded" the symptoms were not likely fibromyalgia. (Tr. 24.). Presley did not "self-diagnose" fibromyalgia; the record in question indicates that Presley "wonders if she might have fibromyalgia – family member has it." (Tr. 377.) Asking a treating physician about a possible cause of symptoms is not "self-diagnosis" and should not weigh against a claimant's credibility. Dr. Jeffery consistently attributed Presley's chronic pain, in part, to fibromyalgia. (Tr. 577–78, 677.) The medical expert testified "I would say that a lot of the pain seems to be related to the fibromyalgia," and that "probably the opiates wouldn't have much effect on the fibromyalgia." (Tr. 767, 769, 770.) Both the opinion of Dr. Jeffery and the testimony of the medical expert indicate that fibromyalgia was likely causing a great deal of Presley's pain. The ALJ's analysis was in conflict with the uncontroverted evidence that Presley's pain was, in part, from fibromyalgia.

### D.      Activities of daily living and progress of Presley's condition after July 2004

Last, the ALJ did not believe that Presley's activities of daily living supported her allegation of disabling pain. (Tr. 26.) The ALJ relied on a July 2004 doctor's note indicating Presley could care for her personal needs, maintain her home, shop, and do other household activities. *Id.* The ALJ then stated he saw no change in her physical condition that would justify the limitations alleged. (Tr. 26.) However, by September of the same year, her Daily Activity Questionnaire indicates that her daughter does most of the house cleaning because Presley develops pain and shortness of breath; she has constant muscle and joint pain that never ceases; she is unable to do stretching, yoga, or massage; and it can take most of her day to get out of bed and shower because of pain and shortness of breath. (Tr. 243–44.)   Additionally, Presley's daughter testified that

Presley is unable to play with her grandchildren, drive them anywhere, or get out of the house often. (Tr. 762–64.)  The medical records reflect Presley's worsening condition.  (Tr. 448, 471, 478, 509, 515, 522–23, 577–78, 655.)

While the ALJ's credibility determination should be given considerable judicial deference, it must be supported by substantial evidence in the record as a whole.  *See Chambliss*, 269 F.3d at 522–23.  An ALJ's "unfavorable credibility evaluation of a claimant's complaints of pain will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints[.]" *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985)(citation omitted).

Based on the foregoing, this court finds that substantial evidence does not support the Commissioner's credibility finding in regard to Presley's allegations of pain.

## II.      The ALJ failed to apply the proper standard in assessing the opinion of Dr. Jeffery, Presley's treating physician.

Presley argues the ALJ failed to accord proper weight to Dr. Jeffery's opinion that she had significant pain from fibromyalgia and cervical DDD and needed to rest for pain management. (Pl.'s Br. 21.)

A treating source is considered more familiar with a claimant's impairments, treatments, and responses, so generally her opinion should be given great weight.  *Newton*, 209 F.3d at 455.  "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Id.* (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1994)).  An ALJ may give little or no weight to the opinion of a treating physician only upon a showing of good cause.  *Greenspan v. Shalala*, 38 F.3d 232, 237

(5th Cir. 1994).  An ALJ may "discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 546.  When an ALJ does not give controlling weight to the opinion of a treating source, he or she must evaluate the opinion under the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d) to determine the weight to give the opinion.  *Id.*  The factors to be considered are (1) the length of the treating relationship; (2) the frequency of examination; (3) the nature and extent of the treatment relationship; (4) whether the physician provides medical evidence to support his opinion; (5) whether the opinion is inconsistent with the record as a whole, and (6) the specialization of the treating physician.  20 C.F.R. §§ 404.1527(d), 416.927(d).

Dr. Jeffery believed that fibromyalgia and cervical DDD were largely contributing to Presley's chronic pain.  (Tr. 515, 577–78, 677.)  She also believed that due to a combination of Presley's impairments, her pain symptoms would require a two-hour rest break after a limited number of working hours.  (Tr. 511–14, 577–78.)  The ALJ rejected these opinions, stating that Presley needed only "normal legal breaks during the work day."  (Tr. 21.)  The ALJ stated that he did not feel Dr. Jeffery's medical source statement was materially different from his RFC, and he did not believe he needed to show good cause for rejecting Dr. Jeffery's opinion.  (Tr. 27.)  In response to a hypothetical offered by Presley's counsel, the vocational expert testified that a person who was only able to work for approximately five hours due to the requirement of two hours to rest would not be able to do competitive work.  (Tr. 784.)  This indicates a material difference in the opinion of Dr. Jeffery and the ALJ's RFC.

Because the ALJ did not give controlling weight to Dr. Jeffery's opinion, he was required

to show good cause for rejecting it.  *See Greenspan*, 38 F.3d at 237.  On remand, the ALJ must properly consider Dr. Jeffery's opinion, and if he rejects it, must show good cause and evaluate the factors set forth in § 404.1527(d), 416.927(d) to determine the weight to be given.

In light of the foregoing, the court does not need to reach Presley's remaining arguments.

<u>Conclusion</u>

For the foregoing reasons, this court recommends that the United States District Court **REVERSE** the Commissioner's decision and **REMAND** this case for further administrative proceedings consistent with this opinion.

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs*. *Auto*. *Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated:        November 22, 2011.

NANCY M. KOENIG
United States Magistrate Judge

21